IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re:<br><br>SATURN CORPORATION,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: |

**AFFIDAVIT OF FIELDING W. YOST IN SUPPORT
OF FIRST-DAY MOTIONS**

I, **FIELDING W. YOST**, being duly sworn, depose and state, under penalty of perjury, that the following information is true to the best of my knowledge, information and belief.

### I.   Background

**A.   Introduction**

1. I am the President of Saturn Corporation (the "Debtor"). I am fully familiar with the day-to-day operations, financial condition, books and records, and business affairs of the Debtor. I submit this Affidavit in support of the Debtor's Chapter 11 petition, first-day applications, and motions listed on **Exhibit A** hereto (collectively, the "First-Day Motions").

2. Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtor's industry, operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtor.

---

[1] The last four digits of the Debtor's tax identification number are 9452.

40000/0704-12847573v2

3.      To minimize any adverse effects on the business as a result of the commencement of the Debtor's Chapter 11 case, the Debtor has requested various types of relief in the First-Day Motions. The First-Day Motions seek relief, among other things, to: (a) approve the Debtor's use of the cash collateral of Wayne Wyvill ("Wyvill"), which is needed to cover day-to-day operating expenses necessary to continue the operations of the Debtor's business; (b) maintain employee morale and confidence; and (c) establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Debtor's employees, vendors, customers and other key constituents, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be critical to its efforts in Chapter 11 and its ability to maximize the recovery prospects for all interested parties. The relief requested in the First-Day Motions is in the best interests of the Debtor and its creditors, and is necessary to avoid immediate and irreparable harm.

B.      **Overview and Growth of the Business**

4.      The Debtor was formed as a corporation under the laws of the State of Maryland in 1981 by myself and 3 other shareholders, who have since died or left the company. It is based out of a two story office building in Cheverly, Maryland. The company provides database management services to non-profit and membership organizations. The Debtor's customers include such notable and worthy charities as the (i) National World War II Foundation Museum, (ii) Cancer Research Foundation International, (iii) Franciscan Mission Association, (iv) Diabetes Research & Wellness Foundation, (v) Bread Line Africa, (vi) Christian Relief Services, (vii) Missionaries of Africa, (viii) Partners with Native American Groups, and (ix) Southwest Indian Foundation. The Debtor has developed proprietary software to maintain data, and assist charities in tracking, communicating and fundraising with their respective members.

5.    By the late 1980's, the Debtor grew its annual revenues to approximately $10 million, with over 245 employees in Maryland working from a 50,000 square foot office. After discussions with a customer in 1991 about similar business opportunities in Europe, the affiliated companies Saturn B.V. (in the Netherlands), Saturn Corporation U.K. (in England), and Saturn France were launched in 1993, 1999 and 2002 respectively. The Debtor then obtained a $1.0 million U.S. Small Business Loan through the First International Bank in 2000 to purchase large-scale laser printing equipment it required for its operations. The loan was secured by the Debtor's assets, and a lien on my residence. UPS Capital Business Credit ("UPS") succeeded First International Bank as the holder of the loan, and the Debtor serviced the loan for 10 years prior to defaulting. The Debtor also has another $450,000 line of credit that was repaid, and an additional $1.3 million U.S. Small Business Loan which was used to refinance prior debt.

6.    But the industry began to change as database management moved away from main frame computers to servers for the storage of data. To keep pace with the industry, the Debtor needed to move its domestic operations to servers as well.

7.    By 2006, the Debtor had close to $12.0 million in sales, so it began the steps necessary to develop new software for use in its business, and complete the transition to servers which was completed in 2009. The Debtor then faced unexpected challenges abroad in 2009 and 2010. French authorities launched an investigation into over a dozen of its French non-profit customers. While the Debtor had nothing to do with the investigation, the Debtor's customers' bank accounts were frozen, costing the Debtor over 1.8 million Euro in unpaid bills. The massive loss in revenue caused, in part, the Debtor to default on its secured debt with UPS. The Debtor subsequently shut down its three European affiliates, and by 2014, it had downsized to 10,000 square feet of office space in Maryland, and reduced its work force to approximately 28 employees.

8. In or around July 2014, UPS sold the loan through a broker to an individual, Wayne Wyvill ("Wyvill"), at a discount. Wyvill knew the Debtor's principals, and apparently believed the purchase of the discounted loan was a sound investment. But when the Debtor failed to service the debt, Wyvill filed confessed judgments against the Debtor and the guarantors in the Circuit Court of Maryland for Anne Arundel County on or about November 17, 2015, and began enforcement actions. Specifically, Wyvill garnished the Debtor's former bank accounts at Bank of America. The garnishment froze approximately $88,000. Some of those funds were advance payments from the non-profit organizations earmarked to pay for the postage required for mailings to its membership, and not even the Debtor's property. Not surprisingly, the garnishment strained the Debtor's liquidity and ability to make payroll and otherwise pay ordinary course expenses. Without the necessary cash to operate, the Debtor filed this Chapter 11 case.

C. **Prepetition Banking Structure**

9. In the ordinary course of business, the Debtor maintains two bank accounts at PNC Bank, N.A (the "Bank Accounts"), that operate as part of the Debtor's cash management system (the "Cash Management System"). Through the Bank Accounts, the Debtor efficiently collects, transfers, and disburses funds generated from its operations. The Debtor routinely deposits, withdraws, and otherwise transfers funds to, from, and between the Bank Accounts.

10. Specifically, the Debtor maintains (1) an operating account; and (2) a payroll account, at PNC. The checking account at PNC is the Debtor's operating account into which all revenues are deposited, and from which the payroll account is funded on a weekly basis for the domestic employees, and a monthly basis for the European employees. The Bank of America accounts are no longer used.

11. As of February 28, 2016, the Debtor's operating account at PNC had a balance of less than $1,000.

D. **Prepetition Financing Structure**

12. Wyvill is the Debtor's only significant prepetition secured creditor, with an approximate $640,000 claim. The Debtor also owes Vision Financial Corp. approximately $22,000.

E. **The Debtor's Need for Use of Cash Collateral**

13. Wyvill is believed to be the only prepetition secured creditor that has a lien on the Debtor's cash and receivables. The Debtor requires the use of all available sources of working capital, including cash collateral, to operate in the ordinary course of business. The Debtor's ability to maintain business relationships with its vendors, licensors, and customers, to pay its employees, and to otherwise fund its operations is essential to its continued viability. The Debtor has several new revenue streams from customers beginning in May 2016 that will provide ample liquidity for the business to operate. If the Debtor is unable to use cash collateral for such purposes, the recoveries for creditors would be greatly reduced since, under a "shut-down" scenario, the current and new customers will be lost, and the value of the Debtor's estate would decline dramatically. The use of cash collateral is thus critical to the Debtor's ability to maximize value for its creditors, in the best interests of the Debtor and its estate, and necessary to avoid immediate and irreparable harm to the Debtor, its creditors, and its assets, businesses, goodwill, reputation and employees.

## II. First-Day Motions[2]

14. Concurrently with the filing of this Chapter 11 case, the Debtor filed a number of First-Day Motions. The Debtor anticipates that the Court will conduct a hearing soon after the

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the respective First-Day Motions.

5

40000/0704-12847573v2

commencement of this case (the "First-Day Hearing"), at which time the Court will hear the First-Day Motions.

15. An important and critical element to the success of this Chapter 11 case will be the entry of orders granting the relief requested in each of the First-Day Motions. Generally, the First-Day Motions are designed to facilitate: (a) the continuation of business operations without interruption, and to approve on an interim basis the use of cash collateral; (b) preservation of customer and vendor relationships; (c) maintenance of employee morale and confidence; and (d) establishment of certain other administrative procedures to promote a smooth transition into Chapter 11. The factual background in support of each First-Day Motion is provided below:

    **A.**     **Debtor's Motion for an Order (A) Authorizing the Debtor's Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. §§ 361, 363 and 552, (B) Granting Adequate Protection, and (C) Scheduling Final Hearing Pursuant to 11 U.S.C. § 363(C)(2) and Fed.R.Bankr.P. 4001 (the "Cash Collateral" Motion").**

16. By this motion, the Debtor is seeking interim approval of the use of cash collateral.

17. Immediate approval of the use of cash collateral, on an interim basis, is crucial to the Debtor's ability to continue its operations in the ordinary course of business. Without such interim approval, the Debtor would be forced to shut down its business, as it would be unable to pay its payroll, licensors, taxing authorities, utilities and other operating expenses, and expenses necessary to service its customers. In such an event, the Debtor, its creditors and estate would be deprived of any prospect of a successful Chapter 11 case.

18. To avoid such irreparable harm to the Debtor and the estate, the Debtor requests that the Court approve the use of cash collateral on an interim basis, pending entry of a final order, to (i) maintain the ongoing operations of the Debtor, and (ii) avoid immediate and

irreparable harm and prejudice to the Debtor's estate and its creditors and other parties in interest. The Debtor can service the debt through its operating revenue on a go forward basis.

19. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Collateral Motion should be approved.

**B. Motion of the Debtor and Debtor-In-Possession for Entry of an Interim and Final Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "<u>Utilities Motion</u>").**

20. By the Utilities Motion, the Debtor seeks entry of an interim and final order: (i) prohibiting the utility providers from altering, refusing or discontinuing service to the Debtor on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) providing that the utility providers have "adequate assurance of payment" within the meaning of Section 366 of the Bankruptcy Code, based, <u>inter alia</u>, on the Debtor's establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtor's estimated average monthly cost of utility service, which may be adjusted by the Debtor for reasons specified herein following the final hearing on this Utilities Motion; and (iii) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtor to provide adequate assurance of future payment to the Utility Providers.

21. In connection with the operation of its business and management of its properties, the Debtor obtains telephone, internet, gas, water, waste removal and/or other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers (collectively, the "<u>Utility Providers</u>"). Annexed to the Utilities Motion is a nonexclusive list of four (4) Utility Providers that provide Utility Services to the Debtor as of the Petition Date. The relief requested in the Utilities Motion relates to all Utility Providers providing Utility Services to the Debtor, and is not limited to those listed on the Utility Service List.

22. In 2015, the Debtor paid an average of approximately $5,000.00 per month on account of Utility Services. Historically, the Debtor has had a good payment history with the Utility Providers. Moreover, to the best of its knowledge, there are few, if any, defaults or arrearages of any significance with respect to the Debtor's undisputed invoices for Utility Services. To provide adequate assurance of payment for future services to the Utility Providers as set forth in Section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit an initial sum equal to fifty percent (50%) of the Debtor's estimated average monthly cost of Utility Services (the "<u>Adequate Assurance Deposit</u>"), into a newly-created, interest-bearing, segregated account (the "<u>Adequate Assurance Account</u>") within twenty (20) days of the Petition Date, pending further order of this Court. Because the Debtor's monthly spending on Utility Services is approximately $5,000.00, the Adequate Assurance Deposit will be approximately $2,500.00.

23. The Debtor submits that the Adequate Assurance Deposit, together with the Debtor's ability to pay for future Utility Services in the ordinary course of business with the use of cash collateral (collectively, the "<u>Proposed Adequate Assurance</u>"), constitute sufficient adequate assurance to the Utility Providers. Accordingly, upon entry of a final order, any Utility Provider that has failed to submit a request for the Proposed Adequate Assurance or otherwise file an Objection to the Utilities Motion as described below, shall be deemed to have been provided with adequate assurance of payment as required by Section 366 of the Bankruptcy Code and shall be prohibited from discontinuing, altering, or refusing to provide Utility Services, including as a result of unpaid charges for prepetition Utility Services.

24. The Debtor further requests that this Court order that, pending a final hearing on the Utilities Motion, all Utility Providers are prohibited from discontinuing, altering, or refusing service to the Debtor, or discriminating against the Debtor on account of the commencement of this Chapter 11 case or any unpaid or prepaid charges.

25. I believe and am advised that the proposed Adequate Assurance Procedures set forth in the Utilities Motion are necessary in this Chapter 11 case, because if such procedures are not approved, the Debtor could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of this Chapter 11 case. I have been further advised that the proposed Adequate Assurance Procedures protect the Debtor without materially prejudicing the Utility Providers.

26. I believe that uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of their reorganization. Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put the Chapter 11 case in jeopardy. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtor's operations, customer relationships, revenues, and profits, seriously putting at risk the Debtor's reorganization efforts and, ultimately, value and creditor recoveries. It is therefore critical that the Utility Services continue uninterrupted during this Chapter 11 case.

27. Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

**C.  Motion of Debtor and Debtor-In-Possession for Entry of an Order Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expense Reimbursements, and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course (the "Employee Motion").**

28. By the Employee Motion, the Debtor seeks entry of an Order (i) authorizing, but not requiring, the Debtor to pay (a) prepetition payroll obligations and related items, (b) employee benefits, and (c) expense reimbursement, (ii) authorizing the continuation postpetition of certain of the Debtor's employment programs and policies in the ordinary course, and the payment to third parties relating to the such programs; and (iii) authorizing and directing

applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtor's payroll accounts to make the foregoing payments.

29. As of the Petition Date, the Debtor has 21 full-time employees and 2 part-time employees in Maryland (the "Maryland Employees"), and 5 full-time employees in Europe (the "European Employees" and together with the Maryland Employees, the "Employees"), consisting of corporate office employees, software designers, data entry and sales

30. Payments to the Employees and withholding taxes are handled by ADP, its domestic payroll provider, and ADP Nederland B.V. and Sail Payroll, its European payroll providers.

31. Maryland Employees are paid every Friday for the prior week. European Employees are paid monthly on the first of each month. Because the Employees are paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages. Specifically, the Maryland Employees are not scheduled to be paid until March 4, 2016 for prepetition wages covering the prepetition period from February 24 to February 28, 2016, and the European Employees are not scheduled to be paid until March 1, 2016 for the period February 1, to February 29, 2016.

32. As of the Petition Date, the aggregate amount of accrued wages and commissions that remain unpaid to the Debtor's Employees is approximately $50,000 (the "Prepetition Payroll Obligations" or "Unpaid Wages").

33. I have been advised that the Unpaid Wages and Employee Benefits that the Debtor seeks to pay with respect to the Unpaid Wages and Reimbursable Expenses are entitled to priority status under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent they do not exceed $12,475.00 per Employee. The Debtor would therefore be required to pay these claims in full in order to confirm a plan of reorganization.

34. The majority of the Debtor's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees would be exposed to significant hardship if the Debtor was not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtor was unable to satisfy such obligations, morale and loyalty would be jeopardized at a time when Employee support is critical. In the absence of such payments, I believe the Employees would seek alternative employment opportunities, thereby hindering the Debtor's ability to meet its customer obligations, and likely diminishing creditors' confidence in the Debtor. In addition, the loss of valuable Employees who have relationships with customers and vendors, and the recruiting efforts that would be required to replace such Employees, would be a massive and costly distraction at a time when the Debtor should be focusing on stabilizing its operations.

35. In addition, the Debtor requests that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtor related to the Employee Wages and Benefits and the Reimbursable Expenses, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date. The Debtor represents that these checks are drawn on identifiable bank accounts. Accordingly, checks other than those for the Prepetition Payroll Obligations, Employee Benefits, and the Reimbursable Expenses will not be honored inadvertently. Moreover, the Debtor represents that it will have sufficient cash reserves to promptly pay all of the Prepetition Payroll Obligations, Employee Benefits and the Reimbursable Expenses, to the extent described herein, on an ongoing basis and in the ordinary course of its business.

36. In sum, the Employees' skills, relationships with customers and vendors, and their knowledge and understanding of the Debtor's operations and customer relations are essential to the continued operations and reorganization of the Debtor's business. Without the continued services of the Employees, I believe an effective reorganization of the Debtor would not be possible.

37. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Motion should be approved.

    **D.    Motion of the Debtor and Debtor-In-Possession for an Order Authorizing Debtor to Continue Use of Cash Management System, Existing Bank Accounts, and Business Forms ("<u>Cash Management Motion</u>").**

38. By the Cash Management Motion, the Debtor respectfully requests the entry of an Order authorizing the Debtor to continue using its existing cash management system, bank accounts and existing business forms (each as defined below).

### The Debtor's Cash Management System and Bank Accounts

39. In the ordinary course of business, the Debtor maintains bank accounts (the "<u>Bank Accounts</u>") with PNC that operate as part of a cash management system (the "<u>Cash Management System</u>").

40. Through the Bank Accounts, the Debtor collects, transfers, and disburses funds generated from its revenues and incoming payments. The Debtor routinely deposits, withdraws, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check and wire transfer.

### The Debtor's Business Forms

41. In the ordinary course of business, the Debtor uses a variety of business forms. To minimize the expense to the estate and to avoid any confusion with suppliers, customers, and employees, the Debtor respectfully requests that the Court authorize the Debtor to continue to

use all business forms, including without limitation, letterhead, customer program forms, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as Debtor-in-Possession.  Granting this relief will allow the Debtor to avoid the cost and delay of ordering new business forms.  Upon depletion of the current stock of forms and checks, the Debtor will obtain new checks and forms that indicate the debtor-in-possession status.

### Continued Use of a Cash Management System and Continued Use of Business Forms Is Warranted

42. The Debtor's Cash Management System and Bank Accounts are established and are significant aspects of the Debtor's ordinary course, essential business practices.  The Debtor's Bank Accounts are part of a system that ensures the Debtor's ability to monitor and control all of its cash receipts and disbursements efficiently.

43. The Debtor's ability to manage collections and track receipts and disbursements using its existing Bank Accounts and centralized Cash Management System is critical to its operations and maximizing the value of the Debtor's bankruptcy estate.  During the pendency of the bankruptcy case, the Debtor intends to fund operations from existing cash and postpetition revenues, all of which revenues will run through its Cash Management System.

44. If the Debtor was required to close its existing Bank Accounts and terminate the Cash Management System immediately, I believe that it would be difficult to establish the required bank accounts promptly and a new cash management system to fulfill the Debtor's business needs.  I also believe the disruption to the ordinary financial affairs of the Debtor would be prejudicial to the Debtor's estate.

45. It is my belief that, absent authorization to continue to use the Debtor's existing Bank Accounts, Business Forms and Cash Management System in the ordinary course of business, significant and unnecessary disruption to the Debtor's business will occur.

### III. Conclusion

46. Approval of the First-Day Motions filed by the Debtor is crucial to the Debtor's ability to continue its business. Without the relief requested, the Debtor would be forced to cease operations and would be unable to pursue its reorganization efforts. The requested relief will also assist the Debtor in maintaining employee morale, retaining employees and establishing certain other administrative procedures to promote a smooth transition into, and eventually out of, Chapter 11.

Dated: February 28, 2016

/s/ Fielding W. Yost
Fielding W. Yost, President